IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ESTEBAN ALCAPONE ROSARIO,<br><br>**Defendant.** | CRIMINAL INDICTMENT<br><br>NO. 1:10-CR-416-WBH-GGB |

**FINAL REPORT AND RECOMMENDATION**

Defendant Esteban Alcapone Rosario ("Defendant") is charged with causing firearms to be shipped in interstate commerce without proper written notice and making false statements to a Federal Air Marshal regarding those firearms, in violation of 18 U.S.C. §§ 922(e) and 1001. Pending before this court are Defendant's motions to suppress statements and evidence [Docs. 18 and 19]. An evidentiary hearing on these motions was held before me on February 17, 2011. All transcript references are to the transcript of that hearing [Doc. 30 ("Tr.__")].

For the reasons discussed below, I recommend that Defendant's motions [Docs. 18 and 19] be **DENIED**.

AO 72A
(Rev.8/8
2)

# I. **FACTS**

## A. **Procedures for transporting firearms in checked baggage**

Airline passengers who wish to transport firearms in checked baggage must declare the firearms with the airline on which they are traveling. A firearm is deemed declared when the passenger notifies the airline about the presence of the weapon, which, in turn, allows the airline to notify the Transportation Security Administration ("TSA"). (Tr. 8, 9, 15).

When a passenger declares a firearm with Delta Air Lines ("Delta"), the carrier involved in this case, Delta makes sure that the firearm is inside a hard-sided case, that the firearm is not loaded, and that there is a means of locking the case. If Delta is satisfied that these conditions have been met, it prepares an orange form that lists the Delta agent's name and the date that the firearm was declared. The orange form is attached to the case of the firearm so that it can be inspected by TSA. (Tr. 16). After a passenger has declared a firearm, the passenger is directed to take the orange form and the checked luggage containing the firearm to the oversized baggage area where the luggage is physically searched by the TSA. (Tr. 9).

AO 72A
(Rev.8/82)

Bags with no declared firearms (or other prohibited items) are placed on the conveyor belt system behind the ticketing agent and routed through an x-ray system. (Tr. 10-11). The x-ray system takes an image of each bag. After several steps of review, if a TSA employee suspects that a prohibited item is in a bag, the bag is physically searched. (Tr. 10-12).

If the luggage contains a prohibited item, the screener is required to notify the TSA Area Supervisor, whose role is to verify that the item found in the luggage is a prohibited item. (Tr. 13). If the item is a firearm, the TSA Area Supervisor is required to contact the TSA Coordination Center, the airline, and local law enforcement. (Tr. 13-14, 17). The airline involved then contacts the person who checked the luggage. That person is requested to return to the location where the bag was checked in by the airline. (Tr. 14, 28).

**B.**     **Events of March 19, 2009**

On March 19, 2009, a Transportation Security Officer ("TSO") at Hartsfield-Jackson Atlanta International Airport saw an x-ray image of Defendant's checked bag which depicted what appeared to be a firearm with a magazine inserted in the weapon. (Tr. 34, 36). After cutting and removing the lock on the outside of the bag, the TSO opened the bag and found two hard-sided cases with no firearm declaration for either

3

case. (Tr. 36-37). One case contained ammunition and the other case contained a firearm. (Tr. 36). At this point, the TSO informed his supervisor, Dennis Thompson ("Thompson"), about his discovery. (Tr. 37).

Upon receiving the information, Thompson looked at the bag and saw the firearm. (Tr. 16, 17). He learned that the bag had been checked in by Delta, but that no orange declaration form was present. (Tr. 17). Based on these facts, Thompson contacted Delta, the TSA Coordination Center, and the Atlanta Police Department ("APD"). (Tr. 17-18). The APD then contacted Federal Air Marshal Supervisor Mark Wooddall and asked him to report to the baggage screening area. (Tr. 54). Defendant was in the screening area just inside the turnstile of the TSA screening facility when Wooddall arrived between 4:00 and 4:15 p.m. (Tr. 55, 58).

APD Officer William Jackson was dispatched to the baggage screening area at approximately 3:49 p.m. Prior to the Defendant's arrival in the screening area, Officer Jackson met with TSA representatives and was told about the discovery of the undeclared weapon. Jackson was shown the weapon and ammunition, which he determined to be a 9 mm MAC-10 submachine pistol manufactured by Masterpiece Arms and a 30-round magazine. (Tr. 39, 55).

4

Jackson asked the Delta agent to find the Defendant and bring him back to the baggage screening area, which was approximately a quarter to a half mile from the gate. (Tr. 28, 40). Delta agents escorted Defendant to the non-restricted foyer just outside the secured baggage screening area about thirty minutes after Officer Jackson arrived. (Tr. 18, 20, 41, 47).

When Defendant arrived in the non-restricted area, Thompson asked him for his driver's license in order to make a copy of it. Thompson also engaged in general conversation with the Defendant. Defendant told Thompson that had checked two bags, one with three weapons and one with a single weapon. Defendant also told Thompson that he had a security business that required him to travel to an island, the name of which Thompson could not recall. (Tr. 19-20).

Officer Jackson also met with Defendant in the unsecured baggage screening area. (Tr. 41). Jackson asked Defendant for his identification and Defendant handed him a Georgia driver's license and a St. Croix, U.S. Virgin Islands, corrections officer identification card. (Tr. 40).

Defendant advised Jackson and Wooddall that he had three declared weapons in a second bag, that he trains law enforcement officers in St. Croix, and that he resided in Macon, Georgia, where he worked as an apartment manager. (Tr. 42-43, 56-57, 63).

5

AO 72A
(Rev.8/8
2)

TSA determined that Defendant's second bag had been screened at the oversize baggage area where declared weapons are sent for inspection, indicating that it contained declared weapons. (Tr. 20). After Officer Jackson found out about the second bag from Defendant, he checked with TSA and learned that the bag was en route to San Juan, Puerto Rico, a stopover on the way to St. Croix. (Tr. 44, 60).

After the twenty minute conversation with Defendant, it was unclear whether the MAC-10 pistol and ammunition had been declared. (Tr. 57). A Delta representative came to the location and took responsibility for not having the weapon and ammunition declared. The Delta representative attempted to complete a declaration form at that time. (Tr. 48-49, 52, 57). Believing that no federal violation had occurred, Wooddall left the scene. Officer Jackson remained to resolve the matter. (Tr. 57).

Officer Jackson was skeptical of Defendant's claim that he had a job in Macon and also worked as a corrections officer in St. Croix which required him to travel back and forth between the two cities. (Tr. 43-44). He also believed that a MAC-10 was not the type of weapon that would be used in training for a law enforcement agency. (Tr. 44). Officer Jackson and Defendant then moved into a conference room in a secure area, and Officer Jackson called the United States Bureau of Alcohol, Tobacco, and Firearms (the "ATF"). (Tr. 46).

6

AO 72A
(Rev.8/82)

While Officer Jackson was on the phone with the ATF, the Defendant started talking and trying to convince Officer Jackson that he was a legitimate corrections officer, and that he had never had a problem. (Tr. 41, 48). After Officer Jackson spoke to an agent with the ATF, he and the Defendant waited inside the secure area for the ATF to arrive. (Tr. 46). Officer Jackson ceased all questioning at that time. (Tr. 48).

The Defendant then made a telephone call. Officer Jackson overheard the Defendant on the phone tell someone that the police will call and that the person should say that the Defendant is a corrections officer. (Tr. 46).

About 6:00 p.m., the Assistant Federal Security Director for Law Enforcement, Rusty Edwards, called Wooddall and told him that he had determined that the MAC-10 had not been declared and that further investigation was necessary. (Tr. 57). Wooddall then returned to the location where Defendant was located. When Woodall returned to the area, Defendant was in an office inside the screening area. Wooddall called the federal security director in San Juan and asked him to intercept Defendant's second bag to see if it contained additional firearms. (Tr. 57-60).

The flight containing Defendant's second bag landed in Puerto Rico between 8:00 and 9:00 p.m. and was searched by the TSA in Puerto Rico. Seven firearms were

7

AO 72A
(Rev.8/82)

found in the bag, four of which were undeclared. Defendant was then arrested. (Tr. 61).

## II.  DISCUSSION

The government has agreed that it will not seek to introduce into evidence any statements made by the Defendant after 6:00 p.m. on March 19, 2009, the time law enforcement officers concluded that the MAC-10 firearm in the bag in Atlanta had not been declared. (Tr. 4). Defendant does not argue that the search of his bag in Atlanta was unlawful. Therefore, the only issues for the court to resolve are whether Defendant's statements prior to 6:00 p.m. should be suppressed and whether the search of his bag in Puerto Rico was unlawful.

**A.  Defendant's Statements**

Defendant argues that he was detained from the time he was taken from the gate to the baggage screening area. He contends that his statements should be suppressed because he was not given Miranda warnings prior to being questioned.

The well-known general rule is that a person who is arrested and detained must be given full Miranda warnings in order for his statements made in response to interrogation by a law enforcement officer to be used against him in court. Miranda v. Arizona, 384 U.S. 436 (1966).

8

Miranda warnings are required only when a defendant is interrogated while in custody. See Stansbury v. California, 511 U.S. 318, 322 (1994). To determine whether a suspect is in custody, the court must examine the objective circumstances from the perspective of a reasonable person in the defendant's position. Berkemer v. McCarty, 468 U.S. 420, 442 & n.35 (1984). While courts consider the totality of the circumstances, "the inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." Stansbury, 511 U.S. at 322 (internal marks and citation omitted); United States v. Acosta, 363 F.3d 1141, 1149 (11th Cir. 2004).

In Acosta, the court determined that Miranda warnings were not required during an investigative stop because the defendant was stopped in a public place and was subjected to a minimal amount of restraint necessary to effect the stop. Law enforcement officers had stopped defendant Acosta in the parking lot of an apartment building during daylight hours. Prior to questioning the defendant, the officers returned their weapons to their holsters. The defendant was allowed to remain standing during questioning and was not handcuffed or placed into a police car at any time. Law enforcement officers assured the defendant that he was not under arrest. The Court held that, based on the totality of the circumstances, "a reasonable person in Acosta's

9

position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." Acosta, 363 F.3d at 1150.

In this case, Defendant emphasizes that the questioning continued after Defendant was brought into a secured area of the airport. While the evidence is conflicting, Wooddall testified that when he arrived, everyone was "inside the turnstile of the TSA South Lower Baggage Screening Facility." [Doc. 33 at 14 (citing Tr. 58)]. However, even if Defendant was questioned in a restricted area, my recommendation would be the same. An airline passenger with potentially dangerous undeclared items in his baggage is not necessarily in custody just because he is required to enter a room beyond the public area of an airport. See United States v. Okelley, 106 F. App'x 577, 578 (9th Cir. 2004)(concluding that pre-Miranda statements made after being "led to the airport police office" were admissible); United States v. Knox, 839 F.2d 285, 292 (6th Cir. 1988)(holding that travelers detained at an airport were not in custody by virtue of the fact that the agents escorted them to the airport security office and then questioned them separately).

Moreover, the Eleventh Circuit has analogized airport security searches to border searches for the purpose of Fourth and Fifth Amendment analysis. See United States

10

v. Vigil-Montanel, 753 F.2d 996, 998 ( 11th Cir. 1985).  Therefore, it follows that any questioning "must have risen to a distinctly accusatory level" before it can be said that Defendant was in custody.  See United States v. Thompson, 2008 WL 1766934, at *5 (M.D. Fla. Apr. 14, 2008)(quoting United States v. Moya, 74 F.3d 1117, 1120 (11th Cir. 1996)(internal marks omitted).

   Here, Defendant made voluntary statements and willingly assisted in efforts to clear up any suspicion that he was unlawfully transporting firearms or ammunition. Defendant was not handcuffed, no weapons were drawn, the questioning at issue lasted only about twenty minutes and was limited to the investigation of a possible undeclared firearm found in Defendant's checked luggage.  During the period in question, Defendant was not formally accused or told that he was under arrest.  There was a strong governmental interest in investigating the circumstances surrounding the weapons and ammunition in Defendant's luggage.  In sum, the facts of this case do not support a conclusion that Defendant was subject to restraints comparable to a formal arrest during the questioning.  Therefore, Miranda warnings were not required and Defendant's statements should not be suppressed.

11

**B.     The Search of Defendant's Bag in Puerto Rico**

Defendant next argues that the search of his bag in Puerto Rico that resulted in the discovery of four undeclared firearms was unlawful because (1) it was the product of unlawful questioning, and (2) there was no reasonable suspicion.

As to the first argument, as discussed above, the questioning of Defendant was not unlawful; therefore, the search was not the product of unlawful questioning.

As to the second argument, once Defendant checked his bags at the airport, they were subject to administrative search.  See United States v. Herzbrun, 723 F.2d 773, 778 (11th Cir. 1984); United States v. Aukai, 497 F.3d 955, 960 (9th Cir. 2007); Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 675 n.3 (1989)(noting favorably the federal government's practice of suspicionless searches of airline passengers and luggage and the lower courts' findings that such searches are reasonable administrative searches under the Fourth Amendment).

Moreover, even if reasonable suspicion was required, reasonable suspicion existed, because at the time Defendant's bags were searched in Puerto Rico, law enforcement authorities had determined that Defendant had attempted to transport a firearm in his other bag without declaring it to the airline.

12

### III.  CONCLUSION

For the reasons stated, I **RECOMMEND** that Defendant's Motion to Suppress Statements [Doc. 18] and Defendant's Motion to Suppress Evidence [Doc. 19] be **DENIED**.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this 11th day of May, 2011.

*Gerrilyn G. Brill*
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)